**Joe FELDER, Petitioner,**

v.

**Glenn S. GOORD, Respondent.**

**No. 06 Civ. 10223(VM).**

United States District Court,
S.D. New York.

June 23, 2008.

Joe Felder, Attica, NY, pro se.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

## I. INTRODUCTION

Pro se petitioner Joe Felder ("Felder") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (2006). Felder was convicted in New York State Supreme Court, New York County (the "Trial Court"), of rape in the first degree in violation of New York Penal Law § 130.35(1) and robbery in the second degree in violation of New York Penal Law § 160.10(2)(a) (collectively, the "Offenses"). Felder, a predicate felon, was sentenced to imprisonment for consecutive terms of twenty-five years for the rape and fifteen years for the robbery. In his petition, Felder raises five claims as bases for habeas relief. First, Felder claims the Trial Court erred in denying his *Batson* challenges to the prosecutor's use of peremptory strikes. Second, Felder alleges ineffective assistance of trial counsel. Third, Felder claims the Trial Court erred in failing to appoint new counsel after Felder asserted a conflict of interest with his trial counsel and requested a new attorney. Fourth, Felder alleges he was deprived of due process because he was denied the right to testify at trial. Finally, Felder alleges the Trial Court failed to properly instruct the jury on reasonable doubt, thus diluting the burden of proof. For the reasons set forth below, Felder's petition is DENIED.

## II. *BACKGROUND*

### A. *FACTS AND PROCEDURAL HISTORY*[1]

Shortly after 7:00 p.m. on January 16, 1998, EA[2], a sales associate at a Macy's department store in Manhattan, entered an employees-only stockroom carrying several robes and encountered Felder, whom she took to be a fellow employee. Immediately upon turning toward a clothing rack, EA was attacked from behind and wrestled to the ground. Felder choked her and repeatedly punched her in the face and head, while EA struggled and screamed. EA offered Felder approximately $500, which she had in her pocket from cashing her paycheck that day. Felder took the money and resumed hitting EA.

Felder instructed EA to remove her clothes, then he pulled her pants and underwear off and raped her. When Felder thought he heard someone at the door of the stockroom and went to check, EA removed her Macy's name badge from her pocket, which had a pin on the back. When Felder returned, EA used the pin to scratch his face. Felder fled the stockroom upon realizing he was bleeding profusely from his face and managed to escape, leaving behind blood stains on a white bathrobe and cardboard box. Macy's security summoned the police, and EA described the attack before being taken to the hospital. DNA testing confirmed the blood stains in the stockroom were from the same person.

Six months after the crime, Alfred Barrow ("Barrow") was arrested for an unrelated crime at the Grand Hyatt Hotel. Security personnel at the hotel informed police that Barrow resembled the police sketch of the Macy's assailant which had been circulated to the public. Upon questioning, Barrow denied involvement with the conduct underlying the Offenses and voluntarily submitted to a DNA test, which confirmed that he was not the perpetrator of the attack on EA. The case remained open until April 2002, when a national DNA data-bank system identified Felder as a match with the DNA recovered from the blood on the robe at the Macy's crime scene. Subsequent testing confirmed the match.

By New York County Indictment Number 3433/02, filed on June 7, 2002, Felder was charged with the Offenses. Counsel was appointed to Felder after he represented to the Trial Court at his arraignment that his mother would be hiring an

---

1. The factual summary below is derived from the *Sandoval* Hearing Transcript (Supreme Court of New York, Part 34, Apr. 10, 2003) ("Sandoval Tr."), the Voir Dire Transcript (Supreme Court of New York, Part 34, Apr. 10, 2003) ("Voir Dire Tr."), and the Trial Transcript (Supreme Court of New York, Part 34, Apr. 14, 2003) ("Trial Tr,"), and the Sentencing Transcript (Supreme Court of New York, Part 34, May 12, 2003)("Sentencing Tr.") in *People v. Joe Felder*, Indictment # 3433–02 (July 7, 2002); and from submissions of the parties to this Court, as well as their earlier submissions to the state courts, namely: Brief for the Defendant–Appellant, dated September 7, 2004 ("Def.'s Br."), Brief for Respondent, dated February 2005 ("Resp't's Br."); Felder's Habeas Corpus Petition, dated August 12, 2006 (the "Petition"); Respondent's Declaration in Opposition to Petition for a Writ of Habeas Corpus, dated August 3, 2007 ("Resp't's Dec."); and Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated August 3, 2007 ("Resp't's Mem."). Except where specifically quoted, no further reference to these documents will be made.

2. By order dated July 26, 2007, the Court granted respondent's request to file its declaration in opposition to Felder's petition and the trial transcript under seal pursuant to New York Civil Rights Law § 50–b. The initials EA are used to protect the identity of the victim.

attorney for him and no counsel appeared at either of the next two adjourned court dates. Felder's appointed counsel, Steven Ross, Esq. ("Ross"), represented him without incident for eight and a half months prior to trial, speaking to him on "many, many occasions." (Sentencing Tr. at 8.)

On the first day of trial, the Trial Court conducted a *Sandoval* hearing to determine how much of Felder's past criminal history could be made known to the jury if Felder testified. Felder informed the Trial Court at that time that he wanted a new attorney because he and Ross were "having a conflict of interest." (Sandoval Tr. at 20.) The Trial Court denied the application. Felder became combative, leading the Trial Court to warn Felder that he was in danger of being removed from the courtroom; Ross asked to be relieved, which was also denied. After a jury was empaneled, the trial commenced the following week. At trial, the prosecutor (the "Prosecution") presented the DNA test results as evidence, and the victim identified Felder as her assailant. Felder's lack of cooperation with both the Trial Court and his attorney, along with his constant outbursts, led to his removal from the courtroom for much of the trial. Felder declined to testify unless he received new counsel.

The jury convicted Felder of the Offenses, and he was sentenced to a total of forty years. Felder appealed his conviction to the New York State Supreme Court, Appellate Division, First Department (the "Appellate Division"). Appellate counsel for Felder argued that the Trial Court committed reversible error when it: (1) refused to appoint new counsel due to the conflict between Felder and his defense attorney; (2) denied Felder the right to testify; (3) ruled against Felder's *Batson* challenges; (4) diluted the burden of proof by failing to instruct the jury

adequately on reasonable doubt; (5) delegated its authority improperly by using court officers to communicate with Felder after he was removed from the courtroom; and (6) imposed consecutive sentences where both crimes were part of the same act.

On April 5, 2005, the Appellate Division unanimously affirmed Felder's conviction. *See People v. Felder*, 17 A.D.3d 126, 793 N.Y.S.2d 20 (App. Div. 1st Dep't 2005). The Appellate Division found that the Trial Court "properly denied Felder's request for new counsel, made as the trial was about to commence and subsequently during trial." *Id.* at 21. The Appellate Division found that Felder was given "ample opportunity" to explain the alleged conflict, but "never elaborated upon his unfocused tirade against his attorney." *Id.* Because Ross "vigorously defended" Felder at trial, and the alleged conflict was either "utterly meritless" or "created by defendant through his unjustified hostility toward his competent attorney," the Appellate Division determined that Felder was not deprived of his right to conflict-free representation. *Id.* at 21–22. The Appellate Division also found that Felder was not deprived of the right to testify, as he was "not entitled" to condition his testimony on receiving new counsel. *Id.* at 22. The Appellate Division also upheld the Trial Court's denial of Felder's *Batson* challenges, finding no pretext for race in the Prosecution's stated reasons for striking jurors. *See id.* Furthermore, the Appellate Division held the Trial Court did not act improperly by using a court officer to relay communications between the courtroom and Felder, or by imposing consecutive sentences for the robbery and rape convictions. *See id.* Finally, the Appellate Division found Felder's challenge to the Trial Court's reasonable doubt charge was unpreserved, and declined to review it

in the interests of justice; "[w]ere we to review this claim, we would reject it." *Id.*

Felder, by a letter dated May 6, 2005 from his counsel, filed an application for leave to appeal to the New York Court of Appeals (the "Court of Appeals"). (*See* letters dated May 6 and June 6, 2006, attached as Ex. D and F, respectively, to Resp't's Dec.) The application renewed several of the arguments presented to the Appellate Division; namely the improper delegation of a court function, the reasonable doubt charge, and the propriety of consecutive sentences. Felder combined the right to conflict-free counsel and the right to testify into a single argument that the Trial Court may not reject the application to testify as containing an improper condition where the defendant and defense counsel had both informed the Trial Court of a conflict of interest, and the defendant explicitly informs the Trial Court that he wants to testify but cannot do so without conflict-free counsel. Lastly, Felder narrowed the *Batson* challenge appeal to one juror, namely whether the Prosecution's proffered reason of not "knowing enough" about a prospective juror in response to a *Batson* challenge was legitimate. On July 20, 2005, the Court of Appeals denied leave. *See People v. Felder*, 5 N.Y.3d 788, 801 N.Y.S.2d 809, 835 N.E.2d 669 (2005). On reconsideration, the Court of Appeals again denied leave in an order dated October 3, 2005. *See People v. Felder*, 5 N.Y.3d 852, 806 N.Y.S.2d 172, 840 N.E.2d 141 (N.Y.2005).

Felder filed a pro se motion dated January 11, 2006, in the Trial Court pursuant to N.Y.Crim. Proc. Law ("NYCPL") § 440.10 (" § 440 Motion"), in which he sought to vacate his conviction on grounds of ineffective assistance of trial counsel, based on:

(1) Ross's failure to address the Prosecution's race-neutral reasons in response to the *Batson* challenges (Felder also challenged the Trial Court's *Batson* rulings); (2) failure to investigate the scene of the alleged crime; (3) failure to prepare Felder for trial or meet him in jail to discuss trial strategy beforehand; (4) failure to provide a defense by calling Alfred Barrow and Forensic Analyst Kelli Langley as witnesses to make the jury aware of "another suspect in the case" (*See* § 440 Motion, attached as Ex. I to Resp't's Dec, at 20–21); and (5) failure to call Detective McCallion ("McCallion") and Criminalist Deborah V. Briones ("Briones").[3] On February 1, 2006, the Trial Court denied the entirety of Felder's § 440 Motion, finding that "[t]he specific as well as the general allegations of inadequate counsel were addressed by the Appellate Division," and that Felder's other claims were either "too vague and irrelevant to require review" or were "on the record." (*See* Order dated February 1, 2006, attached as Ex. J to Resp't's Dec.) Felder appealed the Trial Court's denial of his § 440 Motion to the Appellate Division. (*See* Application for Certificate Granting Leave to Appeal, attached as Ex. K to Resp't's Dec.) On May 4, 2006, the Appellate Division denied Felder leave to appeal. *See People v. Felder*, No. M–1401, 2006 N.Y.App. Div. LEXIS 6400, at *1 (App. Div. 1st Dep't May 4, 2006). Felder sought leave to appeal to the Court of Appeals, which denied his application on June 22, 2006 as not appealable. *See People v. Felder*, 7 N.Y.3d 755, 819 N.Y.S.2d 881, 853 N.E.2d 252 (2006).

## B. *TIMELINESS*

Under 28 U.S.C. § 2244(d)(1), a one-year limitation period applies to the filing

---

**3.** Felder did not specify what McCallion and Briones' anticipated testimony might be or how it would affect Felder's case.

of petitions by state prisoners seeking federal habeas corpus review. This period runs from the date on which petitioner's conviction becomes final on direct review, or the expiration of time to seek appeal. *See* § 2244(d)(1).

■ In the instant case, Felder's limitation period began on January 1, 2 006[4], the date Felder's time expired to seek a writ of certiorari to the Supreme Court challenging the ruling of the Court of Appeals affirming his conviction, rendering Felder's conviction final. Glenn S. Goord ("Respondent") has not disputed the timeliness of Felder's habeas petition, which was filed on September 11, 2006, within the one-year limitation period.

### III. *LEGAL STANDARD FOR HABEAS RELIEF*

■ As a starting point, the Court notes that Felder is a pro se litigant. As such, his submissions must be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citation omitted). The Court must read Felder's submissions "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citation omitted).

■ A petitioner in custody pursuant to a judgment of a state trial court is entitled to habeas relief only if he can show that his detention violates the United States Constitution, federal law, or treaties of the

United States. *See* 28 U.S.C. § 2254(a). Before seeking federal relief, however, a petitioner must exhaust all available state court remedies. *See* 28 U.S.C. § 2254(b)-(c). This standard generally requires that the petitioner "fairly present" his claims to the highest available state court, "setting forth all of the factual and legal allegations he asserts in his federal petition." *Daye v. Attorney Gen.,* 696 F.2d 186, 191–92 (2d Cir.1982) (internal citations omitted).

■ To succeed on habeas, Felder must show that the state court's decision on the merits "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or . . . [was] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1)-(2); *see also Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Henry v. Poole,* 409 F.3d 48, 67 (2d Cir.2005). If a claim has not been presented to a state court but the opportunity to do so has lapsed due to a state procedural bar, the claim is procedurally defaulted but may be "deemed exhausted" for the purposes of the statutory requirement. *See Bossett v. Walker,* 41 F.3d 825, 828–29 (2d Cir.1994).

■ If a petitioner procedurally defaults by failing to comply with the deadline for seeking state-court review or for taking an appeal, the prisoner generally is barred from bringing those claims in a federal habeas proceeding. *See Woodford*

---

**4.** While timeliness is not at issue in Felder's petition, the Court notes that it calculated the start of the one-year limitations period from 90 days after the Oct. 3, 2005 "upon reconsideration" denial of leave to appeal to the Court of Appeals. *See, e.g. Mathieu v. Giambruno,* No. 05 Civ. 8098, 2008 WL 383509, at *12 (S.D.N.Y. Feb. 11, 2008); *Mateos v. West,* 357 F.Supp.2d 572, 575 (E.D.N.Y.2005). Were the Court to calculate using the date of the original denial of leave to appeal (July 20, 2005), Felder's deadline for filing the petition would have been October 18, 2006, meaning Felder's petition would have been timely under either start date for the one-year limitations period. was filed on September 11, 2006, within the one-year limitation period.

*v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In such procedural default cases, a federal habeas court may review a petitioner's claims only if the petitioner demonstrates (1) cause for the default and resulting prejudice, or (2) that the failure to consider the claims will "result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *Day v. Taylor,* 459 F.Supp.2d 252, 256 (S.D.N.Y.2006).

■ Under the "cause and prejudice" test, "cause" is defined as "some objective factor external to the defense" that impeded the defendant's efforts to raise the claim. *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (*quoting Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). To demonstrate prejudice, a petitioner must show more than that errors "created a possibility of prejudice, but [instead] that they worked to his actual and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), *see also Day,* 459 F.Supp.2d at 256. In order to excuse a procedural default under the alternative "fundamental miscarriage of justice" test, a petitioner must show through "new reliable evidence" that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence". *Schlup v. Delo,* 513 U.S. 298, 324, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

## IV. *DISCUSSION*

### A. *BATSON CHALLENGES*

Felder asserts that the Trial Court erred in finding that the Prosecution was not using peremptory strikes to unlawfully discriminate against black and Hispanic jurors. Construed liberally, the Petition raises all five *Batson* rulings by the Trial Court.

■ The use of a peremptory challenge to exclude a potential juror because of his or her race violates the Equal Protection Clause of the Constitution. *See Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To combat discrimination in jury selection while protecting the traditional use of peremptory challenges free of judicial control, *Batson* established a three-step evidentiary test. *See Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). First, the objecting defendant must make a prima facie showing that peremptory challenges are being used to exclude jurors because of their race. The moving party may establish a prima facie case that the other party is using peremptory challenges to remove a cognizable class of jurors based solely on the evidence concerning the exercise of peremptory challenges at trial. *See Batson,* 476 U.S. at 96, 106 S.Ct. 1712. The moving party "must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petite jury on account of their race." *Id.* While the objecting party must establish a prima facie case, "[t]he burden ... is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. 1712. The moving party need not establish that it is more likely than not that peremptory challenges were used in a discriminatory manner. *See Johnson v. California,* 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).[5]

**5.** Although both *Rice* and *Johnson* were decided after the Trial Court's determination of

The defendant need only establish "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* Once the moving party establishes a prima facie case, the burden shifts to the striking party to provide a race-neutral explanation for striking the jurors in question. *See Rice,* 546 U.S. at 338, 126 S.Ct. 969. Finally, if the striking party provides a race-neutral explanation, the Trial Court must determine whether the defendant has carried his burden of proving purposeful discrimination. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

During each of two rounds of jury selection, Felder raised a *Batson* challenge to the Prosecution's use of peremptory challenges. In each round, the Trial Court first asked the panelists as a group about general legal principles. This was followed by each juror reviewing, in narrative form, his or her answers to a jury questionnaire, and finally the questioning of each juror by the attorneys. In the first round, the Prosecution struck six of eighteen prospective jurors; three were white, two were African–American (Stanley Harper ["Harper"] and Delores Adams ["Adams"]), and one appeared to be of "Hispanic heritage" (Brian Campos ["Campos"]). (Voir Dire Tr. at 103–104.) Felder's counsel asserted that the Prosecution had challenged three out of the five "minorities" on the panel. (*Id.* at 103.) The Prosecution disputed the existence of a prima facie showing, arguing that three of the six challenges were to white jurors, only one of two panelists with an Hispanic surname had been struck, and only two of four African–American panelists had been challenged.

"Reluctantly, in order to give the benefit of the doubt to [Felder]", the Trial Court asked the Prosecution to provide race-neutral reasons for the three challenged strikes. (Voir Dire Tr. at 105.) The Prosecution explained that two of the jurors (Harper and Campos) had been struck because they had only a high-school education, and "the People left no one on who has only a high-school education." (Voir Dire Tr. at 106.) The Prosecution struck Adams, who had a bachelor's degree, because she was the panelist about whom the Prosecution "knew the least," based on her terse answers to the jury questionnaire and in response to the attorneys' questioning. (Voir Dire Tr. at 106.)

Felder's counsel named four other prospective jurors who "could be said" to have answered with a comparable amount of detail to Ms. Adams, and asserted that the Prosecution had failed to provide an adequate race-neutral reason. (Voir Dire Tr. at 107.) The Trial Court denied the *Batson* challenge, finding that the stated reasons for the peremptory strikes were race-neutral and not a pretext for racial discrimination, and noting that the Trial Court had "the benefit of having heard and observed the jurors, in terms of their intelligence." (Voir Dire Tr. at 107.)

During the second round of jury selection, Felder's counsel made two *Batson* challenges to the Prosecution's use of peremptory strikes. The Trial Court stated specifically that it did not find there to be

Felder's *Batson* challenge and his direct appeals to the Appellate Division and Court of Appeals, *Rice* and *Johnson* predated the Trial Court's denial of Felder's § 440 Motion and the appeal of that decision to the Appellate Division. Construed liberally, Felder's pro se § 440 Motion raises the Trial Court's *Batson* rulings as grounds for vacating his conviction.

(*See* § 440 Motion, attached as Ex. I to Resp't's Dec., at 18–19.) Therefore, *Rice* and *Johnson* are "[Supreme] Court [] decision[s] as of the time of the relevant state-court determination," and are binding and relevant precedents. *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

any pattern of discrimination, but asked the Prosecution to provide race-neutral reasons on the record for the benefit of federal habeas corpus proceedings. The Prosecution explained that it struck prospective juror Shannon Boltz ("Boltz") after it was discovered during questioning that he had a brother currently incarcerated for rape, despite Boltz not volunteering this information in response to the pertinent question on the jury questionnaire. Furthermore, Boltz did not have anything beyond a high-school education. The second *Batson* challenge in round two pertained to Gregory Warner ("Warner"), who was similarly struck for having only a high-school education, and the Prosecution also noted that Boltz did not seem to be "of high function" mentally. (Voir Dire Tr. at 166.) Felder's counsel alleged pretext, arguing that Boltz had said his brother's conviction would not influence him and that Warner seemed to be functioning "as well as any of us." (Voir Dire Tr. at 169.)

The Trial Court denied the *Batson* challenge, concluding that Felder had not met the burden of explaining how education was a pretext for race. The Trial Court found the Prosecution's race-neutral explanation to be "reasonable," non-pretextual, and having "ample precedent in the authority"; the Trial Court added that the Prosecution had been "consistent" in its use of educational level to strike jurors. (Voir Dire Tr. at 169–70.) Specifically, the Trial Court noted that Warner's "ability to express himself orally, to articulate his points were certainly suggestive to this Court that he was of a low level of intelligence and communications skills." (Voir Dire Tr. at 170.)

Felder appealed the *Batson* rulings regarding prospective jurors Adams, Campos, Harper, and Warner to the Appellate Division in his initial appeal. After the Appellate Division rejected those claims,

Felder's application for leave to appeal to the Court of Appeals asserted only a *Batson* claim regarding Adams, and thus, only the *Batson* claim regarding Adams was properly exhausted on direct appeal.

1. *Felder's Batson Claim Regarding Prospective Jurors Boltz, Campos, Harper, and Warner*

a. *Exhaustion*

In order to comply with 28 U.S.C. § 2254(c), a New York State petitioner for federal habeas corpus who fails to raise a claim on direct appeal must exhaust all available post-conviction remedies under N.Y.Crim. Proc. Law § 44 0.10. *See Bacchi v. Senkowski*, 884 F.Supp. 724, 730–31 (E.D.N.Y.1995). A liberal reading of Felder's pro se § 440 Motion raises the Trial Court's *Batson* rulings regarding prospective jurors Boltz, Campos, Harper, and Warner as grounds for vacating the Trial Court's judgment. (*See* § 440 Motion, attached as Ex. I to Resp't's Dec, at 18.) Felder sought leave to appeal the denial of the § 440 motion from both the Appellate Division and the Court of Appeals. Consequently, all of Felder's *Batson* claims have been exhausted in the state courts.

b. *Procedural Bar*

Despite meeting the exhaustion requirement, these claims are procedurally barred from habeas review. Under NYCPL § 440.10(2)(c), collateral review of a judgment is not available under § 440.10 if the claim could have been raised on direct review. New York State courts "must deny a motion to vacate" a conviction upon a particular issue when "sufficient facts appear on the record of the proceedings underlying the judgment" to have permitted "adequate review" of the issue on direct appeal and there was an "unjustifiable

216

failure" to raise the issue on direct appeal. NYCPL § 440.10(2)(c).

 Under Second Circuit precedent, a court's reliance on NYCPL § 440.10(2)(c) serves as independent and adequate state procedural grounds. *See, e.g. Reyes v. Keane,* 118 F.3d 136, 139 (2nd Cir.1997). A claim resolved on independent and adequate state procedural grounds is generally not subject to review on habeas. *See Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

 The rejection of Feider's § 440 Motion by the Trial Court appears to use NYCPL § 440.10(2)(c) as the basis of its decision for Feider's potential *Batson* claims, as it tracks the "on the record" language of subsection (c) in stating that "[a]ny other claims are too vague and irrelevant to require review or are 'on the record.'" (*See* Order dated February 1, 2006, attached as Ex. J to Resp't's Dec.) Leave to appeal this order was subsequently denied by the Appellate Division. *See Felder,* 2006 N.Y.App. Div. LEXIS 6400, at *1.

 Because Feider's *Batson* claims regarding Boltz, Campos, Harper, and Warner are procedurally barred, the Court will not review the merits of these claims unless Felder demonstrates either cause and prejudice to excuse the failure to appeal these claims, or that a fundamental miscarriage of justice would occur were this Court not to review the claims. *See Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. Felder has not asserted any "cause" for his failure to pursue the defaulted claims or actual "prejudice" from barring the claim. Feider's petition contains no expla-

nation as to why he failed to raise a claim in the Appellate Division as to Boltz, or to appeal the Appellate Division's rejection of the claims for Campos, Harper, and Warner.[6] Likewise, Felder offers no demonstration that the failure to consider his defaulted claims will result in a fundamental miscarriage of justice, as the claims are meritless. The Trial Court credited the Prosecution's race-neutral reasons for striking jurors Campos, Harper, and Warner in the original *Batson* inquiry, and the Appellate Division found the reasons were not pretextual. Felder has offered no additional explanations for why these findings should be overturned. As to Boltz, it is objectively reasonable to strike a juror whose brother is facing prosecution for the same type of crime as the accused. Accordingly, Felder's *Batson* claims regarding prospective jurors Boltz, Campos, Harper, and Warner are procedurally barred.

### 2. *Felder's Batson Claim Regarding Prospective Juror Adams*

 Felder's *Batson* claim pertaining to prospective juror Adams was properly exhausted on direct appeal and was not procedurally defaulted. In order to overturn a state-court determination on the merits of a *Batson* motion, a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, this Court can grant Felder's petition only if it was unreasonable to accept the Prosecution's race-neutral explanation for its peremptory strike of Adams. *See Rice,* 546 U.S. at 338, 126 S.Ct. 969. Under the Antiterrorism and Effective Death Penalty Act of 1996

**6.** Simple attorney error* or inadvertence does not constitute "cause" for a default unless the error rises to the level of a violation of the Sixth Amendment; the ineffective assistance of counsel is a "cause" for a default which can be attributed to the State. *See Coleman v. Thompson,* 501 U.S. at 753–754, 111 S.Ct. 2546.

("AEDPA"), state-court factual findings are presumed correct, and the petitioner has the burden of rebutting this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

■■■■■ The Court is not persuaded that the Trial Court's evaluation of the Prosecution's race-neutral reason for striking Adams was unreasonable. It is doubtful whether there was even a prima facie case for discrimination, because the record of the first round of jury selection shows equal numbers of "white jurors" and "minorities" struck by the Prosecution, and a minority panelist left on the jury for every one removed. (*See* Voir Dire Tr. at 104.) The Prosecution's stated reason for striking Adams, an insufficient amount of personal information to make the Prosecution feel comfortable in choosing her, is borne out in the record. The presumption of correctness in the Trial Court's findings on habeas review applies with special force to *Batson* rulings. *See Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (explaining that the trial court is in the best position to evaluate the demeanor and credibility of the prosecutor and the potential jurors). Felder has not established "clear and convincing evidence" rebutting this presumption of correctness. *See* § 2254(e)(1). Accordingly, the Court denies Felder's *Batson* claim regarding Adams.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

### 1. Introduction and Background

Felder alleges ineffective assistance of trial counsel because of Ross's failure to: (1) investigate the scene of the alleged crime; (2) call important fact witnesses or any witnesses on Felder's behalf; (3) present a medical expert to rebut the DNA evidence against Felder; (4) prepare Feld-er for trial or meet him in jail to discuss a defense strategy prior to trial; and (5) prepare any type of defense. Further, Felder claims the Trial Court erred in failing to appoint new counsel after Felder asserted a conflict of interest with his trial counsel and requested a new attorney. Felder's conflict with counsel claim was properly raised on appeal and exhausted. He raised the ineffective assistance of counsel claim for the first time in the § 440 Motion to Vacate Judgment, and exhausted his appeals from the Trial Court's denial.

During the *Sandoval* hearing on the first day of trial, when the Trial Court warned Felder against speaking so loudly to Ross, Felder stated that he wanted a new attorney because he and his counsel were "having a conflict of interest." (Sandoval Tr. at 20.) The Trial Court denied Felder's request to change attorneys, as trial was about to begin and "[t]his attorney has been appointed and is prepared and ready to try this case." (*Id.* at 21.)

Felder became uncooperative, and declared an intention to tell the jury that Ross was not his attorney. He asserted that his trial was "political," and that the judge should hold him in contempt or remove him from the courtroom, (*Id.* at 21–22.) The Trial Court informed Felder that he had a right to be present for his trial, but warned him that it was dependent upon him conducting himself "in a manner that doesn't interfere with the trial and doesn't prejudice your case," which would be considered a waiver of his right to be present. (*Id.* at 22–23.) Felder asserted that his mother would be hiring an attorney for him, who would "be here the next time I come to court." (*Id.* at 24.) The Trial Court responded, "There is no more next time. This case is ready and we're now ready to proceed." (*Id.*) Felder continued to insist that he could not go for-

ward without an attorney and that the Trial Court could not force him to accept Ross as his attorney. The Trial Court again cautioned Felder that his behavior was putting his right to be present for trial at risk.

Ross then asked to be relieved. Although the Trial Court understood Ross was "having a difficult time communicating" with his client, it was "confident" Ross was "representing [Felder's] very best interests" and believed that the case was ready for trial. (*Id.* at 27.) Jury selection commenced thereafter, during which Ross consulted with Felder repeatedly, without complaint by Felder (the transcript reveals at least ten of f-the-record discussions between Felder and Ross).

The trial began the following week, and there were no further outbursts by Felder during the opening statements and the testimony by the victim and her subsequent cross-examination by Ross. However, following the lunch recess, Felder had several outbursts which eventually led to his being removed from the courtroom. Felder addressed the jury directly as soon as they took their seats, stating that Ross was not his attorney and that "[t]hey" were "railroading" him. (Trial Tr. at 86.) In an apparent attempt to taint the jury as they filed out of the courtroom, Felder related that he had three felony convictions and thirty-two misdemeanor convictions and that the police had identified Barrow as another suspect for the Offenses. Felder then repeatedly cursed the court officer who approached him as the Trial Court attempted to settle him down.

After further warnings from the Trial Court that Felder would be removed if he acted out again, the jury was recalled. As soon as the jury was seated, Felder again told the jury that Ross was not his attorney and that the DNA from the crime scene had identified two different individuals' blood. Felder accused the Trial Court of wanting to "railroad" him because Macy's was a "billion dollar conglomerate." (*Id.* at 92.) Felder then insisted on being removed from the courtroom. As he was being led out, Felder called out to Ross: "I got somebody coming to you. You better not handle this case. You better remove yourself." (*Id.* at 93.)

After hearing testimony that afternoon from six witnesses, four of whom were cross-examined by Ross, the Trial Court ordered a ten-minute break. During the break, Ross asked for a mistrial to be declared and new counsel appointed for Felder. Ross stated that he felt disturbed by the threats made by Felder as he was being led out of the courtroom earlier in the afternoon (the "Threat Comment"), and that he had doubts about his ability to represent Felder's best interests in light of these threats. The Trial Court denied Ross's request and ordered the trial to proceed, as the Prosecution had "virtually presented their whole case," and Ross had provided "as competent a representation as can be provided under these circumstances." (*Id.* at 138–139.) The Trial Court expressed confidence in Ross's ability to put aside his feelings toward the "hostile" Felder, and "overcome the sort of veiled threat, which is something that [Felder] probably has no capability of acting on" because of his incarceration. (*Id.* at 138.) The Trial Court stated that declaring a mistrial "would not be in the interests of justice" as it would be rewarding Felder's attempt to sabotage the trial. (*Id.*)

The following morning, Felder was brought to the courtroom and given the opportunity to stay for the trial. Felder reiterated his intention to tell the jury that Ross was not his attorney, and called Ross "an agent of the state." (*Id.* at 162–64.) The Trial Court, again, ordered Felder to

be removed. The Prosecution continued presenting their case, calling the detective from the Crime Scene Unit who collected the DNA evidence and the detective from the Special Victims Unit in charge of the investigation, as well as the DNA expert who matched the blood from the crime scene to Felder. Ross cross-examined all three witnesses. After the Prosecution rested, Felder was recalled to the courtroom to ask whether he wished to testify. Felder again insisted that Ross was not his attorney, was "an agent of the state," and that his mother would bring his lawyer to court the next day. (*Id.* at 250–51.) Felder declined an invitation to stay for the closing arguments, and asked to be removed from the courtroom. Trial was then concluded without Felder's presence.

### 2. *Ineffective Assistance of Counsel*

To prove ineffective assistance of counsel, Felder must show that: (1) counsel's performance was deficient, in that it fell below an objective standard of reasonableness measured by prevailing professional norms; and (2) a reasonable probability existed that, but for counsel's deficient performance, the outcome of the trial would have been different or that the defect in counsel's performance deprived the defendant of a trial whose result is reliable. *See Strickland v, Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To demonstrate that counsel's performance was unreasonable, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052 (internal citations and quotation marks omitted). In effect, the petitioner must indicate "errors so serious that counsel was not func-

tioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687, 104 S.Ct. 2052, and that the attorney "failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar circumstances," *Boria v. Keane,* 99 F.3d 492, 496 (2d Cir.1996) (citation omitted). In assessing counsel's performance, "the court must be 'highly deferential,' must 'consider [ ] all the circumstances,' [and] must make 'every effort ... to eliminate the distorting effects of hindsight.' " *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (*quoting Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052).

The Court is not persuaded that the performance of Ross was deficient, and concludes that Felder has failed to rebut "the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The record reflects that Ross actively and ably participated in every stage of trial despite having a difficult case and client to defend. At the *Sandoval* hearing, Ross attempted to constrain the jury's knowledge of Felder's past criminal history. During jury selection, Ross consulted with Felder many times and brought the *Batson* challenges discussed above. Ross's opening statement, subsequent cross-examinations, and closing argument consistently attempted to establish Felder's innocence. Ross made arguments that the victim's identification of Felder years after the crime was suspect; that there was a lack of physical evidence of rape in that there was no semen; that the stockroom where the crime occurred had other entrances not observed by security cameras; that the DNA methodology employed by the Prosecution was unreliable; and that the presence of Felder's DNA at the crime scene simply proved he was there "at some

point" and may have resulted from a prior theft by Felder, (Trial Tr. at 268.) In short, Ross made efforts to sow reasonable doubt, yet the jury found there was none. Felder's claim that Ross failed to prepare any type of defense is plainly meritless.

At the sentencing hearing, Ross continued to vigorously defend Felder, asking the Trial Court to consider that Felder had maintained his innocence and that his past criminal history was mostly non-violent, and arguing that the Trial Court should not punish Felder for exercising his rights at trial.

▮ Felder has not demonstrated sufficient prejudice to his defense which would have affected the outcome at trial. Felder does not set forth how visiting the crime scene would have bolstered his defense. The record shows that Ross discussed the case with Felder on "many, many occasions" prior to trial. (Sentencing Tr. at 8.) Felder does not set forth what testimony would be proffered by a DNA expert or any other witnesses that Ross purportedly failed to call, or how that testimony would have affected the result of his trial. The decision whether to call any defense witnesses, like that of whether and how to cross-examine a witness, "fall[s] squarely within the ambit of trial strategy, and, if reasonably made, will not constitute a basis for an ineffective assistance claim." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987). Accordingly, Felder's ineffective assistance of counsel claim is denied.

### 3. Conflict with Counsel

▮ While the Sixth Amendment guarantees the right to counsel for criminal defendants, indigent defendants do not have a veto over who is appointed to defend them, provided that appointed counsel's representation is adequate. *See Caplin & Drysdale v. United States,* 491 U.S.

617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *see also United States v. Schmidt,* 105 F.3d 82, 89 (2d Cir.1997) (noting that "[b]ecause the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing"). Substitution of assigned counsel during trial requires the defendant to "show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Calabro,* 467 F.2d 973, 986 (2d Cir.1972). The Sixth Amendment may be violated where a court "refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney." *Id.* In the absence of a genuine conflict implicating the Sixth Amendment, "[j]udges must be vigilant that requests for appointment of a new attorney on the eve of trial not become a vehicle for achieving delay." *United States v. Llanes,* 374 F.2d 712, 717 (2d Cir.1967).

▮ The trial court's decision not to substitute counsel upon a defendant's request is reviewed under an "abuse of discretion" standard, considering the following factors: (1) the timeliness of the defendant's motion; (2) the adequacy of the trial court's inquiry into the defendant's complaint about counsel; (3) whether the attorney/client conflict was so great that it had resulted in "a total lack of communication preventing an adequate defense"; and (4) whether the defendant substantially and unjustifiably contributed to the communication breakdown. *United States v, John Doe # 1,* 272 F.3d 116, 122–23 (2d Cir.2001).

■ Felder's claim that his counsel was ineffective because of a conflict of interest and that the Trial Court erred in refusing to substitute counsel is meritless. Felder fails to demonstrate that a substitution of attorneys was warranted. Any such "conflict" between Felder and Ross was likely the result of Felder's own manufacture. Felder's motion to substitute counsel was made immediately before trial, and was clearly not timely. Felder belatedly asked for a new attorney at the end of the *Sandoval* hearing, moments before jury selection, with an unsubstantiated "conflict of interest" as the only reason given. While Felder continued to rail against the Trial Court and Ross during his constant outbursts at trial, he never expressed precisely why he was requesting new counsel. The Court agrees with the Appellate Division's finding that Felder had "ample opportunity to be heard, but never elaborated on his unfocused tirade against his attorney, and his disruptive conduct made further inquiry impossible." *Felder*, 793 N.Y.S.2d at 21. Nothing in the record suggests that Ross was ineffectively representing Felder; as such, any purported "conflict" did not affect Ross's ability to present an adequate defense.

■ Felder's only arguable grounds suggesting a conflict arise from the Threat Comment. Given that trial had already begun and Felder's threat seemed unlikely to be carried out, it was not an abuse of discretion for the Trial Court to deny Ross's request to be relieved. There is no evidence that after the Trial Court denied his request to be relieved by reason of the Threat Comment, the quality of Ross's representation diminished or otherwise became ineffective. Accordingly, Felder's ineffective assistance of counsel claim because of a conflict of interest is denied.

## C. *RIGHT TO TESTIFY*

■ Felder's claim that the Trial Court denied him his right to testify was raised and exhausted on direct appeal. A criminal defendant has a constitutional right to testify at trial under the Sixth Amendment. *See Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (stating that "[i]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and testify on his or her own defense"). However, the right to testify can be waived if done so knowingly and voluntarily. *See Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir.1997).

■ At the close of the Prosecution's case, Felder was recalled to the courtroom, as he had been previously removed due to his disruptive conduct. At that time, he was repeatedly informed by the Trial Court of his right to testify, yet refused to do so unless he received new counsel. (*See* Trial Tr. at 249–51.) While Felder expressed a desire to testify, he refused to accept the reality of the situation when the court pointed out that the "case [was] going to be over" and that the time for Felder to testify was then. (*Id.* at 250.) Instead, Felder repeated that he would testify "when I get my lawyer" and eventually asked the Trial Court to remove him from the courtroom. (*Id.* at 250–51.) The record makes it abundantly clear that Felder was well aware of his right to testify, and that he was given the opportunity to do so. By raising a condition that he had been advised would be rejected, he knowingly and voluntarily waived his right by refusing to testify. Having already denied Felder's request for new counsel, the Trial Court did not commit error in accepting such an unreasonable condition as a waiver of Felder's right to testify. Accordingly, as the Trial Court's decision was not "contrary to, or based on an unreasonable application of, clearly estab-

lished federal law," Felder's claim for habeas relief based on a denial of his right to testify is denied. 28 U.S.C. § 2254(d)(1).

 Furthermore, the Court is not persuaded that Felder has shown a reasonable probability that his testimony would have affected the outcome of his trial. The Prosecution presented DNA evidence linking Felder to the crime scene, and the victim identified Felder as the perpetrator. In addition, the Trial Court ruled in the *Sandoval* hearing that, if Felder testified, the Prosecution could elicit that Felder had three prior felony convictions, more than twenty misdemeanor convictions, and had used six different aliases, which most likely would have substantially damaged the credibility of any testimony Felder could have provided.

### D. *REASONABLE DOUBT JURY INSTRUCTION*

Felder's last claim for habeas relief is that the Trial Court's jury instructions diluted the Prosecution's burden of proof, thus denying him of due process. Specifically, Felder alleges that the Trial Court's explanation of the concept of a "lack of evidence" prevented the jury from adequately considering the lack of evidence of his guilt in their deliberations.

After the closing statements, the Trial Court instructed the jury that "[t]he burden of proof is on the People" and "stays with the People throughout your deliberations." (Trial Tr. at 295.) The Trial Court stated that the standard for guilt was "proof beyond a reasonable doubt," and then defined reasonable doubt as

> a doubt which you conscientiously have after having applied your powers of reason and logic. For it to be reasonable, it must be based upon the nature and quality of the evidence or the lack of evidence if you conclude that the evi-

dence the [P]eople have presented is insufficient.

(*Id.* at 295–96.) The Trial Court then explained that the concept of a "lack of evidence" was not freedom to speculate:

> When we refer to lack of evidence, I'm not inviting you to speculate about what additional evidence were to have been presented [sic] may or may not have established.

> You're not to speculate about matters that are not before you.

> What I mean by lack of evidence is, if you determine that the evidence that the People have offered fails to establish this defendant's guilt beyond a reasonable doubt, then you have a lack of evidence and in that case, you should conclude the People have not met their burden.

(*Id.* at 296.)

 At trial, Felder did not object to any part of the Trial Court's jury instruction, but instead raised this argument for the first time on his direct appeal to the Appellate Division. The Appellate Division rejected this claim as "unpreserved." *Felder*, 793 N.Y.S.2d at 22. A declaration that a claim is "unpreserved" is a sufficient indication that the state court denied the claim based on independent and adequate state procedural grounds. *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir.2005). Although the Appellate Division went on to state that it would reject the claim were it to be considered, an alternative ruling on the merits does not remove the procedural bar created by the independent and adequate state ruling. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Green*, 414 F.3d at 294.

 New York's contemporaneous objection rule, NYCPL § 470.05(2), barred Felder's claim because he failed to object

to the instruction during trial. The Second Circuit recognizes New York's contemporaneous objection rule as an independent and adequate state procedural rule barring habeas review. *See, e.g., Richardson v. Greene,* 497 F.3d 212, 218 (2d Cir.2007). Accordingly, the Court denies Felder's reasonable doubt claim as procedurally barred.

 Even assuming, however, that Felder's erroneous jury instruction claim were properly preserved, the Court would still deny it on the merits. To be cognizable on habeas, a challenge to a jury charge must show not only that it is erroneous, but that it violates a federal right. *See United States ex rel. Smith v. Montanye,* 505 F.2d 1355, 1359 (2d Cir.1974). "An erroneous state jury instruction is typically grounds for federal habeas relief only if it 'so infected the entire trial that the resulting conviction violates due process.' " *Valtin v. Hollins,* 248 F.Supp.2d 311, 316 (S.D.N.Y.2003) (*quoting Blazic v. Henderson,* 900 F.2d 534, 541 (2d Cir. 1990)); *see also Middleton v. McNeil,* 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004); *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

 Further, as explained above, the state court's ruling must be not only erroneous, but "contrary to, or ... an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil,* 541 U.S. at 437, 124 S.Ct. 1830. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* (*quoting Boyde v. California,* 494 U.S. 370,

378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

 Felder has failed to meet this burden. The Trial Court clearly stated that the burden remained with the Prosecution to prove Felder's guilt beyond a reasonable doubt, and in no way "diluted" the concept of reasonable doubt when it stated that "[w]hat I mean by lack of evidence is, if you determine that the evidence that the People have offered fails to establish this defendant's guilt beyond a reasonable doubt, then you have a lack of evidence and in that case, you should conclude the People have not met their burden." (Trial Tr. at 296.) Felder argues that this sentence, with its "if ... then" grammatical construction, eliminated any jury consideration of a lack of evidence during their deliberations. Felder contends that under this instruction, the jury could not consider the lack of evidence of his guilt until after they had already found there to be a reasonable doubt as to his guilt. The Court is not persuaded that this is the correct interpretation of language at issue.

 A more reasonable interpretation of the "if-then" construction is that the Trial Court seems to be restating or equating the two concepts, and did not intend to direct the jury to engage in a sequential or chronological exercise. *If* the evidence fails to establish guilt beyond a reasonable doubt, *then* this is what is meant by the concept of a lack of evidence. Even assuming the grammatical construction left something to be desired, the jury instructions as a whole adequately conveyed the concept of reasonable doubt and did not rise to the level of "infect[ing] the entire trial" with constitutional error. *Valtin,* 248 F.Supp.2d at 316. The Trial Court's instructions were hardly contrary to, or an unreasonable application of, United States Supreme Court precedent. Accordingly, Felder's claim that the Trial Court's rea-

sonable doubt charge violated his right to due process is without merit.

## V. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the petition of Petitioner Joe Felder ("Felder") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

As Felder has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 111–13 (2d Cir.2000).

The Clerk of the Court is directed to close this case.

**SO ORDERED.**